IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| H. OLIVIA LORD, § | |
| § | |
| Plaintiff, § | |
| § | |
| V. § | CIVIL ACTION NO. 3:11-CV-3241-M |
| § | |
| DWAYNE A. THOMPSON, § | |
| § | |
| Defendant. § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff H. Olivia Lord files this First Amended Complaint and in support respectfully shows the Court as follows:

### I. INTRODUCTION

1. This is an action for money damages brought pursuant to 42 U.S.C. § 1983 and § 1988 for violations of Plaintiff's rights guaranteed by the United States Constitution, and under the statutory and common law of the State of Texas, against Dwayne A. Thompson, a police officer employed by the City of Dallas, Texas.

### II. PARTIES

2. Plaintiff H. Olivia Lord (hereinafter "Lord" or "Plaintiff") is an individual residing in Dallas, Texas.

3. Defendant Dwayne A. Thompson (hereinafter "Thompson" or "Defendant") was at all times relevant to this Complaint a police officer for the Dallas Police Department ("DPD"), employed by the City of Dallas, Texas. Defendant was, at all times, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs,

and usages of the State of Texas and/or the City of Dallas, Texas. Defendant Thompson is sued in his individual capacity and may be served at his place of business located at 1400 South Lamar Street, Dallas, Texas 75215.

### III. JURISDICTION

4. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C §1331, as this lawsuit arises under the Constitution, laws, or treaties of the United States.

### IV. VENUE

5. Venue is proper in this Court under 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

### V. FACTS

**OVERVIEW**

6. On May 9, 2010, Michael Burnside, died of a self-inflicted gun shot to the right temple. It was immediately obvious that Mr. Burnside's death was a suicide. Despite the fact that everyone from first responders, to the Parkland medical staff, to the field agent for the Medical Examiner's office, believed it to be a suicide, Defendant Thompson was intent on charging Plaintiff with Mr. Burnside's death. Defendant ultimately caused Plaintiff to be arrested and charged with the first degree felony offense of Murder.

7. The warrant for arrest of Plaintiff was obtained by Defendant Thompson after he knowingly and intentionally, or with reckless disregard for the truth, presented to the Magistrate Judge an affidavit that contained misleading assertions of fact and wholly omitted significant exculpatory information. Among the omissions were the most significant facts known by Defendant at the time the Affidavit was presented – that

Mr. Burnside had died from a contact wound to the right temple, and that his gun was found on the floor right next to him.

8. Probable cause for Plaintiff's arrest would not have existed had Defendant accurately set forth in the Affidavit for Arrest Warrant all material facts pertaining to Michael Burnside's death. The facts and circumstances surrounding Mr. Burnside's death and Plaintiff's subsequent arrest are as follows:

**BACKGROUND INFORMATION**

9. Plaintiff was born and raised in Dallas, Texas and at the time of this incident she was 32 years old. Plaintiff and Michael Burnside began a romantic relationship in June 2009 and prior to Mr. Burnside's death, and they were making plans to marry.

10. In October 2008, Mr. Burnside purchased a house located at 13721 Spring Grove Drive in Dallas. Plaintiff and Mr. Burnside were in the process of remodeling the house as she prepared to move in with Mr. Burnside.

**MAY 9, 2010, MR. BURNSIDE DIES**

11. On the evening of May 8, 2010 Plaintiff, Mr. Burnside, and Bryan Jaffe, a close friend of Mr. Burnside's, worked together on home repair projects inside the Burnside house. Over the course of the evening, Mr. Burnside drank to excess and became intoxicated. While drinking that evening, Mr. Burnside toyed with a handgun that he kept in the house.

12. Shortly after midnight on May 9, 2010, just after Mr. Jaffe had gone home, Plaintiff heard a loud noise. When she went to the kitchen, she found Mr. Burnside on the floor, bleeding from his head. Mr. Burnside's handgun lay nearby. Plaintiff attempted in

vain to stop the blood flow. She telephoned Mr. Jaffe, who did not answer. She immediately called 911.

13. Soon thereafter, first responders arrived at the scene. It was immediately apparent to the first responders that Mr. Burnside had shot himself. Mr. Burnside was transported to Parkland Hospital, where attempts to save his life were unsuccessful.

14. Upon Mr. Burnside's death, a field agent from the Medical Examiner's office was notified. The field agent's observations are clearly reflected in notes she made soon after his death in which she records the manner of death as an "apparent suicide". Also significant is the fact that the emergency room doctor who examined Mr. Burnside also believed that Mr. Burnside had shot himself and that Mr. Burnside's death was caused by an "apparent self-inflicted gun shot wound to temple."

15. Defendant Thompson arrived at the location after first responders. After conducting an investigation of the scene and talking with other law enforcement officers that were present, he took Plaintiff and Mr. Jaffe (who had returned to the house) to the police station to be interviewed.

16. Defendant Thompson first interviewed Mr. Jaffe. Mr. Jaffe told Defendant Thompson that Mr. Burnside had been drinking vodka and energy drinks, a volatile combination. He also told Defendant Thompson that Mr. Burnside behaved carelessly with guns, often slinging them around and "being stupid" with them.

DEFENDANT ACCUSES PLAINTIFF OF MURDER

17. Following Mr. Jaffe's interview, Defendant Thompson interviewed the distraught Plaintiff. Defendant Thompson accused Plaintiff of murdering Mr. Burnside. He

hammered questions at her and yelled obscenities. Defendant Thompson's partner, Detective Dale Lundberg, also questioned Plaintiff. Throughout, Plaintiff adamantly maintained her innocence and offered to submit to any test.

18. Both Defendant Thompson and Detective Lundberg told Plaintiff they suspected her of murder. Defendant Thompson relied heavily on an alleged seven-minute gap between Plaintiff's telephone call to Mr. Jaffe and her telephone call to 911. Defendant Thompson insinuated that Plaintiff shot Mr. Burnside, tried to contact Mr. Jaffe, cleaned up any evidence of a murder, and called 911 seven minutes later. Defendant Thompson said, "We wouldn't even be here if it wasn't for the seven minute gap."

**TELEPHONE RECORDS CONFIRM PLAINTIFF IMMEDIATELY CALLED 911**

19. But telephone records conclusively prove no such gap exists.

20. Unbelievably, despite the importance Defendant Thompson placed on the alleged gap, he did not request the 911 tapes before they were destroyed thirty days later. Defendant likewise did not obtain Plaintiff's telephone records until after criminal charges had been filed.

**DEFENDANT THOMPSON CONTACTS THE MEDICAL EXAMINER**

21. Before the Affidavit to obtain the arrest warrant, Defendant Thompson contacted the same field agent for the Medical Examiner's office who had previously noted Mr. Burnside's cause of death as an "apparent suicide." As reflected in the field agent's notes, Defendant Thompson was "very curious to know if the gunshot wound was a contact wound." The Medical Examiner's office confirmed that the wound was indeed a contact wound. In fact, the wound was to the right temple. Mr. Burnside was right-

handed. As set forth below, this critical information was entirely omitted from Detective Thompson's affidavit used to obtain the warrant for Plaintiff's arrest.

**DESPITE LACK OF EVIDENCE, DEFENDANT PURSUES AN INVESTIGATION OF PLAINTIFF**

22.     Shortly thereafter and despite a lack of evidence, Defendant Thompson asked the Medical Examiner to wait to make an official determination on Mr. Burnside's manner of death.

23.     Defendant proceeded with the investigation yet failed to take steps that any competent detective would have taken. Even a cursory investigation would have revealed that Plaintiff was financially independent, had no access to Mr. Burnside's bank accounts, and inherited nothing. Completing basic investigatory tasks would have provided further confirmation of Plaintiff's innocence, yet Defendant failed to request the 911 recordings, failed to request Plaintiff's telephone records, failed to test Plaintiff's clothing for blowback particles, and failed to submit any hand wipings to test for gunshot residue.

24.     One month after Mr. Burnside's death, Detective Lundberg recorded an interview with Mr. Burnside's neighbor, Sheida Rastegar. Citing statements made by Mr. Rastegar during this interview, Defendant Thompson informed relatives of Mr. Burnside, and others, that Plaintiff had admitted to shooting Mr. Burnside.

25.     In fact, a review of Mr. Rastegar's taped interview indicates that he was entirely unsure of exactly what he heard, if he heard anything at all. Mr. Rastegar informed the police officers that he had put the matter out of his mind and that he could not swear to what Plaintiff said to him. Mr. Rastegar repeated multiple times that

Plaintiff's words gave him "an impression" and that he "surmised" that Plaintiff must have shot Mr. Burnside and that the shooting was an accident.

26.     Mr. Rastegar told Detective Lundberg that he believed Plaintiff had killed Mr. Burnside by piecing together what he believed to be the facts.  The witness stated that because only two people were there, and because he later heard that Mr. Burnside had been shot in the back of the head, he surmised that Plaintiff must have shot Mr. Burnside. Mr. Rastegar repeated this statement multiple times and demonstrated by putting his hand behind his head.  At no point did Detective Lundberg correct Mr. Rastegar's misconception. Instead, he encouraged the witness to draw conclusions from these "facts" that Lundberg knew were not accurate.

27.     Taking the interview of Mr. Rastegar in its entirety, it is abundantly clear that anything he thinks he might have heard was premised on his faulty assumption – that Mr. Burnside had been shot in the back of the head.  Mr. Rastegar repeatedly deflected Detective Lundberg's attempts to put words in his mouth regarding an alleged confession by Plaintiff to Mr. Rastegar.  Mr. Rastegar repeatedly refused to commit to the suggestions by Detective Lundberg that Plaintiff may have said, "It was an accident" or "I shot him." Despite the fact that Mr. Rastegar told Lundberg that he needed to leave, Lundberg persisted in asking Mr. Rastegar to commit to "an approximation" or the "gist" of what Plaintiff said.  Finally, Mr. Rastegar stated that Plaintiff possibly said something like "I didn't mean it."  Even then, Mr. Rastegar refused to definitively commit to this statement and insisted that he could only be certain of his own understandings and impressions, not

of Plaintiff's exact words. Despite all of this, Defendant Thompson asserts in the affidavit that Plaintiff admitted to Mr. Rastegar that she had shot Mr. Burnside.

**MISREPRESENTATIONS TO MEDICAL EXAMINER**

28. Following the Rastegar interview, and prior to his affidavit, Defendant met with Medical Examiner Reade Quinton and represented to him that they now had a witness who said the Plaintiff had admitted shooting Mr. Burnside, and that Plaintiff had "blowback" evidence on her clothing. Detective Thompson encouraged the Medical Examiner to rule the case a homicide. As a result of Defendant Thompson's representations, the Medical Examiner changed the manner of death finding to Homicide.

29. Testing later proved that Plaintiff did not have "blowback" evidence on her clothing. In fact, at the time Defendant Thompson made this representation to the Medical Examiner, he had yet to even request Plaintiff's clothing be tested for blowback. Months after Plaintiff's arrest, the same Medical Examiner was presented with information demonstrating the lack of blowback evidence, and the truth of the Rastegar interview. He withdrew his finding of homicide as the manner of death.

**THE AFFIDAVIT TO OBTAIN AN ARREST WARRANT**

30. On June 9, 2010 (one month after Mr. Burnside's death), Defendant Thompson swore in an affidavit that certain facts were true in order to obtain an arrest warrant. After a brief recitation of background facts, the affidavit sets out only two grounds to establish probable cause. First, Defendant Thompson makes the conclusory allegation that statements by Plaintiff were "inconsistent" with Mr. Jaffe's statements. Yet the affidavit gives no details as to what the inconsistencies were. There is no attempt by

Defendant to provide any further explanation or description; he simply states "she provided a statement that was inconsistent with the statement that was given by the complainant's friend." See the Affidavit of Arrest Warrant that is attached as Exhibit A to this Complaint. Exhibit A to this Complaint is incorporated herein by reference.

31. In actuality, there was no inconsistency. Both Plaintiff and Mr. Jaffe told Defendant during their interviews that Mr. Burnside loved life. While Mr. Jaffe could not articulate a reason why Mr. Burnside would commit suicide, upon pressing from Defendant, Plaintiff explained that Mr. Burnside's financial troubles could have motivated his decision. Apparently it is from this exchange that Defendant claimed an inconsistency to exist between Mr. Jaffe's statements and Plaintiff's statements. Defendant Thompson knowingly and intentionally, or with reckless disregard for the truth, artfully worded the affidavit in a way that could be expected to lead the Magistrate Judge to believe the "inconsistency" concerned the shooting.

32. The second possible basis in the affidavit for probable cause centered on Mr. Rastegar's interview. According to the arrest affidavit, Mr. Rastegar said that Plaintiff "made an excited utterance to him inferring that she did not mean to shoot" Mr. Burnside. For the reasons stated above, this is a gross misrepresentation of what Mr. Rastegar actually said during his interview. Mr. Rastegar said that he could not remember exactly what Plaintiff said, but that based on what he believed (including the erroneous belief that Mr. Burnside had been shot in the back of the head), he "inferred" or "surmised" that Plaintiff shot Mr. Burnside. Over and over, Mr. Rastegar said that he was not sure what

Plaintiff had said to him, yet Defendant Thompson presents it as if Rastegar heard Plaintiff admit to the shooting.

**THE OMISSIONS**

33. The information omitted from the affidavit by Defendant Thompson would have negated probable cause. Despite a duty to include information that weighs against probable cause, Defendant Thompson knowingly and intentionally, or with reckless disregard for the truth, failed to include any exculpatory information, and even failed to state that the gunshot wound was a contact wound to the temple. In a case in which everyone from the Plaintiff in her initial interview, to first responders, to the Medical Examiner's field agent, to physicians at Parkland Hospital believed it to be a suicide, there could not possibly be a more important, relevant fact to include in his affidavit than the fact that it was a contact wound to the temple. Yet Defendant Thompson knowingly and intentionally, or with reckless disregard for the truth, omits any reference to this fact in his affidavit.

34. The affidavit sworn to by Defendant Thompson concludes: "Based on the totality of the evidence obtained, detective believes that probable cause exists for the issuance of the arrest warrant." In fact, the totality of the evidence proved that probable cause did not exist, but because Defendant Thompson knowingly and intentionally, or with reckless disregard for the truth, failed to present an accurate portrayal of the "totality of the evidence" in his affidavit, an arrest warrant was signed and issued on June 9, 2010.

**PLAINTIFF'S ARREST**

35. After obtaining an arrest warrant, Defendant prepared to arrest Plaintiff. During this process, Defendant Thompson learned that Plaintiff had traveled to California. Defendant was specifically told that she was traveling with her nieces and nephew on a pre-arranged trip to visit her father. Despite knowing this information, Defendant Thompson alleged in the prosecution report that Plaintiff had "fled" to California prior to her arrest. The airplane tickets were purchased thirteen days prior to the issuance of the arrest warrant.

36. On June 11, 2010, Plaintiff was arrested while visiting her father. Plaintiff spent nine days in jail in California prior to her release.

37. News of her arrest spread quickly, and Plaintiff's reputation in the community in which she had grown up was destroyed. Friends and acquaintances abandoned her. The next eleven months were a nightmare as Plaintiff lived with the possibility that she could spend the rest of her life in prison for a crime she did not commit.

**Examining Trial**

38. On August 10, 2010, an examining trial was conducted. Defendant Thompson admitted that no forensic evidence implicated or in any way tied Plaintiff to the shooting. He admitted that Plaintiff did not delay in calling 911. He admitted that a contact wound is more consistent with suicide than murder. Defendant Thompson also admitted that he may have told people that blow-back blood stains were found on Plaintiff's clothes even though he did not know this fact to be true.

39. During his testimony, Defendant Thompson misrepresented multiple facts. For example, he grossly misrepresented the angle of the bullet, demonstrating the angle by placing his right index finger to his right lower jaw and pointing it upward. He also relied heavily on Mr. Rastegar's interview, even though he knew Mr. Rastegar had been anything but definitive concerning statements attributed to Plaintiff.

**CHARGES DROPPED**

40. On May 11, 2011, the case against Plaintiff was no-billed by the Dallas County Grand Jury. From the time of her arrest, Plaintiff has suffered terribly and her agony is compounded by the knowledge that the police officers in charge of investigating the matter prosecuted her on a completely baseless action. All of this has caused, and continues to cause, Plaintiff to suffer depression, insomnia, nightmares, and constant anxiety of the most extreme nature. Plaintiff's reputation has been permanently damaged.

## VI. CAUSES OF ACTION UNDER 42 U.S.C. § 1983

41. Paragraphs 1 – 40 set forth above are incorporated herein by reference.

42. Plaintiff had a clearly established Constitutional right to be free from unlawful arrest. As a direct result of Defendant's conduct, Plaintiff was falsely arrested and charged with Murder, despite the absence of probable cause to establish that she had committed a crime. Defendant's conduct, as described above, deprived Plaintiff of her right to be secure in her person against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

43. At the time Defendant Thompson applied for the arrest warrant he knowingly and intentionally, or with reckless disregard for the truth, misrepresented the

facts (as described above) in an effort to cause the Magistrate Judge to sign the arrest warrant for Plaintiff, even though probable cause did not otherwise exist.

44. Additionally, Defendant Thompson knowingly and intentionally, or with reckless disregard for the truth, omitted from his affidavit material facts within his knowledge which would have negated probable cause.

45. Moreover, as a result of the unlawful arrest of Plaintiff, Defendant deprived Plaintiff of her liberty without due process of law and deprived her of equal protection of the laws, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

46. Defendant Thompson's actions that caused Plaintiff to be arrested and charged with Murder, as described in this Complaint, were done knowingly and intentionally, or with reckless disregard for the truth.

47. As a direct result of Defendant's conduct and actions, as set forth above, Plaintiff has suffered mental/emotional injuries and was deprived of her constitutional rights, all to her damage.

48. In Paragraphs 41 – 47 above, Plaintiff pleads civil liability against Defendant based on a "Franks" violation by Defendant. See, *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed.2d 667 (1978). See also, *Hale v. Fish,* 899 F.2d 390, 400 n.3 (5th Cir. 1990).

49. In the alternative, and incorporating Paragraphs 1 – 48 by reference, Plaintiff pleads that Defendant Thompson is liable to Plaintiff in that he knowingly and intentionally, or with reckless disregard for the truth, presented a facially deficient

warrant affidavit to the Magistrate Judge.  As a direct result of Defendant's conduct and actions, Plaintiff was wrongfully arrested even though probable cause did not exist.

50.     For all the reasons set forth above, this arrest was a violation of Plaintiff's Fourth Amendment rights to be free from an unreasonable and illegal seizure of her person.  By this pleading, which is made in the alternative to the above-described *Franks* violation, the Plaintiff is invoking the doctrine as set forth in *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 89 L. Ed.2d 271 (1986), and its progeny.

### VII.  STATE LAW CLAIM – MALICIOUS PROSECUTION

51.     Paragraphs 1 – 50 set forth above are incorporated herein by reference.

52.     As set forth above, a criminal prosecution was commenced against Plaintiff, and the Defendant initiated or procured the prosecution.  The prosecution was terminated in Plaintiff's favor when the Murder charge was "no-billed" by the Grand Jury.  Plaintiff is innocent of the charge.

53.     Defendant did not have probable cause to initiate or procure the prosecution of Plaintiff, and he acted with malice.  Plaintiff suffered damages as a result of this malicious prosecution, including harm to her reputation, emotional distress, the cost of defense, and other damages.  Plaintiff's injuries resulted from Defendant's malice, which entitles Plaintiff to exemplary damages under Texas Civil Practices & Remedies Code § 41.003(a).

## VIII. DAMAGES

54. As a direct and proximate result of the acts and omissions outlined above, Plaintiff has been severely damaged. Defendant's conduct has caused Plaintiff to suffer extreme emotional and mental anguish.

55. Plaintiff seeks compensatory damages in an amount deemed sufficient by the trier of fact to compensate her for her damages, which includes past and future mental anguish, past and future pain and suffering, past and future damage to her reputation, and past and future lost wages and lost earning capacity.

56. Plaintiff also seeks damages for the costs she incurred in having to defend against the false criminal charges filed against her. Those costs include the money she paid for legal representation.

57. Plaintiff also seeks exemplary damages.

58. Plaintiff has retained the services of the undersigned attorney, and claims entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988.

## JURY DEMAND

59. Plaintiff demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that this Court grant to Plaintiff a trial by jury herein; award compensatory damages to Plaintiff against the Defendant; award exemplary damages to Plaintiff against Defendant; award costs of this action to the Plaintiff; award reasonable attorney's fees and costs to the Plaintiff; and award such other and further relief as this Court may deem appropriate.

Respectfully submitted,

By:   */s/ Don Tittle*
     Don Tittle
     State Bar No. 20080200
     dontittle@earthlink.net
LAW OFFICES OF DON TITTLE, PLLC
6301 Gaston Avenue, Suite 440
Dallas, Texas 75214
(214) 522-8400
(214) 389-1002- Fax

*ATTORNEY FOR PLAINTIFF*
*H. OLIVIA LORD*