## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| H. OLIVIA LORD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:11-CV-3241-M |
| | § | |
| DWAYNE A. THOMPSON, | § | |
| | § | |
| Defendant. | § | |

_____

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Respectfully submitted,

By:  /s/ Don Tittle_____
   Don Tittle, attorney-in-charge
   State Bar # 20080200
LAW OFFICES OF DON TITTLE
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
(214) 522-8400
(214) 389-1002- Fax
dontittle@earthlink.net

*ATTORNEY FOR PLAINTIFF*
 *H. OLIVIA LORD*

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

I.  SUMMARY OF PLAINTIFF'S RESPONSE                                                     1

II.  SUMMARY JUDGMENT EVIDENCE                                                          2

- Dallas Police Detectives Investigate the Burnside Death                              2
- Thompson Interviews Brian Jaffe                                                      4
- Jaffe Tells Thompson That Burnside Was Reckless With Guns                            5
- Thompson Misrepresents the Circumstances of Burnside's Death to
  Potential Witnesses                                                                  5
- Gannon Confirms to Thompson that Burnside Played With Guns
  While Drinking                                                                       6
- The Medical Examiner's Autopsy of Burnside's Body                                    7
- Thompson Misleads the Medical Examiner                                               8
- The Videotaped Interview of Sheida Rastegar                                          10
- Thompson Prepares an Affidavit of Arrest Warrant Seeking Lord's
  Arrest                                                                               13
- The Magistrate Signs an Arrest Warrant for Lord Based on
  Thompson's Affidavit                                                                 13
- Thompson Writes a Prosecution Report Indicating that Lord Had Fled
  to Escape Arrest                                                                     14
- Thompson Testifies at Lord's Examining Trial in Her Criminal Case                    15

III.  ARGUMENT AND AUTHORITIES                                                          15

A.  Thompson is Not Entitled to Qualified Immunity for Lord's Federal
    Claims                                                                             16

1.  The Facts That Lord Has Alleged Establish a Violation of a
    Constitutional Right                                                               16

a.  Thompson's Affidavit Omitted Significant
    Exculpatory Evidence That Was Critical to a Finding
    of Probable Cause and Misrepresented That Probable
    Cause Existed Based on the Totality of the Evidence                                18
    (1)  Allegedly Inconsistent Statement of Lord                                      19
    (2)  Alleged Excited Utterance by Lord to Rastegar                                 21

- Thompson's Characterization of Rastegar's Statement is Materially Misleading 22
- Thompson Impliedly Represented That Rastegar's Statement Was Reliable When it Actually Was Completely Unreliable 24
- Thompson Changes His Story 26
- Thompson Changes His Story, Again 27
- Further Proof that Thompson is Being Less Than Forthcoming 28

    (3) "Based on the Totality of the Evidence . . ." 28
- Thompson Never Disclosed to the Magistrate that Burnside, Who Was Right-Handed, Died of a Contact Wound to the Right Temple 29
- Thompson Never Disclosed to the Magistrate that Burnside Was Reckless with Guns 31

   b. No Reasonable Officer Could Have Considered the Omissions and Misrepresentations to be Lawful 32

   (1) Expert Report of Kim Sanders 32

   (2) Expert Report of Kenneth LeCesne 34

2. Lord's Fourth Amendment Right to be Free from Unlawful Arrest Was Clearly Established at the Time of Thompson's Misconduct 35

3. On its Face, the Affidavit for Arrest Warrant Does Not Establish Probable Cause for Murder 36

B. Thompson is Not Entitled to Official Immunity for Lord's State Law Claim 37

1. Thompson Has Failed to Establish That His Actions in Misleading the Magistrate and Misrepresenting that Probable Cause Existed From the Totality of the Evidence in His Affidavit Were Taken in Good Faith 39

2. Alternatively, There Are Genuine Issues of Material Fact as to Whether Thompson Has Established Good Faith 41

IV. CONCLUSION 41

CERTIFICATE OF SERVICE 42

# TABLE OF AUTHORITIES

## Cases

*Blackwell v. Barton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    34 F.3d 298, 303 (5th Cir.1994)

*Franks v. Delaware* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35
    438 U. S. 154, 171, 98 S. Ct. 2674, 2684, 57 L.Ed.2d 667 (1978)

*Hale v. Fish* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    899 F.2d 390, 399 (5th Cir. 1990)

*Harless v. Niles* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,41
    100 S.W.3d 390, 398 (Tex. App.—San Antonio 2002, no pet.)

*Harlow v. Fitzgerald* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    457 U. S. 800, 818 (1982))

*Hart v. O'Brien* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35
    127 F.3d 424, 443 (5th Cir. 1997)

*Illinois v. Gates* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18
    462 U. S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)

*Jennings v. Patton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    644 F. 3d 297, 300 (5th Cir. 2011)

*Jones v. City of Grand Prairie, Tex.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 41
    No. 3:97-CV-1907-H, 1997 U.S. Dist. Lexis 217, (N.D. Tex. Jan. 6, 1999)

*Kroger Tex. L.P. v. Suberu* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    216 S.W.3d 788, 792 n.3 (Tex. 2006)

*Malley v. Briggs.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    475 U. S. 335, 345, 106 S. Ct. 1092, 1098, 89 L.Ed.2d 271 (1986)

*Pearson v. Callahan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    555 U. S. 223, 231 (2009)

*Richey v. Brookshire Grocery Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    952 S.W.2d 515, 516 (Tex. 1997);

*Telthorster v. Tennell* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
    92 S.W.3d 457, 461 (Tex. 2002)

*United States v. Jackson*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    818 F.2d 345 (5th Cir.1987)

*United States v. Park* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    531 F.2d 754, 758-59 (5th Cir. 1976)

*United States v. Martin* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    615 F.2d 318, 329 (5th Cir. 1980)

*United States v. Ventresca* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    380 U. S. 102, 108, 85 S. Ct. 741, 746, 13 L.Ed.2d 684 (1965)

*Univ. of Houston v. Clark* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
    38 S.W.3d 578, 580 (Tex. 2000)

*Wadewitz v. Montgomery* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    951 S.W.2d 464, 467 (Tex. 1997)

**<u>Rules and Statutes</u>**

Texas Penal Code § 19.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

Texas Penal Code § 6.03(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff H. Olivia Lord submits this Brief in support of her Response to Defendant's

Motion for Summary Judgment (docs. #22-24), and would respectfully show the Court as

follows:

## I.      SUMMARY OF PLAINTIFF'S RESPONSE

Shortly after midnight in the early morning of May 9, 2010, after drinking heavily

throughout the evening, Michael Burnside ("Burnside") stood in his kitchen, placed a gun

to his right temple, and fired.  His girlfriend Olivia Lord ("Lord") was in another room of

Burnside's home at the time.  Lord rushed into the room where Burnside lay bleeding,

called 911, and Dallas Police Department officers and an ambulance responded.  Burnside

was pronounced dead at Parkland Hospital a few minutes after he was transported there.

A month after Burnside's death, Dallas Police Department detective Dwayne A.

Thompson ("Thompson") submitted a sworn Affidavit of Arrest Warrant to a Dallas

magistrate to obtain a warrant for Lord's arrest on a charge of murder.  Thompson

intentionally or recklessly omitted from the Affidavit substantial evidence that, considered

as a whole, was exculpatory, and selectively submitted evidence in a manner that was

misleading.  These omissions and misstatements negated probable cause to arrest Lord.

Thompson further misrepresented to the magistrate that probable cause existed "based on

the totality of the evidence obtained" when the totality of the evidence tended to negate

rather than support probable cause.  Ultimately, a grand jury heard the evidence and

refused to indict Lord for murder.

In this Brief and her Appendix, Lord presents summary judgment evidence refuting Defendant Thompson's alleged entitlement to qualified immunity on her federal claims under 42 U.S.C. § 1983, and official immunity on her state claim for malicious prosecution. The summary judgment evidence includes documents obtained in discovery, deposition testimony, and expert testimony, and shows that Thompson's conduct violated Lord's constitutional rights and constituted malicious prosecution under Texas law. At the very least, the evidence that Lord submits raises genuine issues of material fact as to Thompson's entitlement to qualified or official immunity. Therefore, Thompson's motion for summary judgment should be denied in its entirety.

## II.    SUMMARY JUDGMENT EVIDENCE

Lord disputes several of the "undisputed" facts that Thompson relies on in his summary judgment motion. Lord cites the following evidence in support of her response:

<u>Dallas Police Detectives Investigate the Burnside Death</u>

Dwayne Thompson and Dale Lundberg are homicide detectives with the Dallas Police Department. (P. App. 14) (Examining Trial Transcript at p. 5, l. 5-7), (P. App. 58) (Lundberg Depo. at p. 5, l. 3-6) Thompson and Lundberg were assigned as the responding detectives on a "suicide call" at the Burnside home. (P. App. 59) (Lundberg Depo. at p. 8, l. 3-8) Thompson was the lead detective primarily responsible for the decisions made on the case, and Lundberg passed on all relevant details of his own part of the investigation to Thompson.. (P. App. 59, 64) (Lundberg Depo. at p. 8, l. 12-18 and p. 68, l. 16-21)

Thompson arrived at the scene of the incident on May 9 at 1:30 a.m. (P. App. 38)

(Thompson Depo. at p. 18, l. 5-7)  By the time Thompson arrived, Burnside had already been transported to Parkland Hospital.  (P. App. 53) (Thompson Depo. at p. 116, l. 24 - p. 117, l. 3)

Lundberg went to Parkland Hospital in the early morning hours after Burnside's death and learned that Burnside had died from a contact gunshot wound to his right temple.  Lundberg related this information to Thompson by at least 7:00 a.m. that same morning.  (P. App. 60,61) (Lundberg Depo. at p. 36, l. 3 - p. 37, l. 1 and p. 40, l. 2-4) Lundberg examined Burnside's body and found no signs of a struggle.  (P. App. 61) (Lundberg Depo. at p. 41, l. 2-4) The only injuries he saw were to Burnside's head.  *Id.* at p. 41, l. 16-18)  The police found a 9mm Beretta handgun but were unable to recover fingerprints because of blood on the gun.  (P. App. 24) (Examining Trial Transcript at p. 15, l. 8-15)

Lundberg never believed that Burnside had been shot in the back of the head.  (P. App. 64)  (Lundberg Depo. at p. 69, l. 8-10)  Lundberg testified that Thompson could not have believed that Burnside had been shot in the back of the head after Lundberg returned from Parkland that morning and told Thompson about the injuries Lundberg had observed to Burnside's right temple.  (P. App. 64,65)  (Lundberg Depo. at p. 69, l. 11 - p. 70, l. 1) Lundberg testified in his deposition that the diagram of Burnside's head wounds that the medical examiner prepared for the autopsy correspond with what he told Thompson on the morning of Burnside's death.  (P. App. 134, 60,61) (Diagram) (Lundberg Depo. at p. 37, l. 4 - p. 39, l. 21)

Thompson Interviews Brian Jaffe

A few hours after Burnside's death, Thompson interviewed Burnside's friend Brian Jaffe at police headquarters. (P. App. 23) (Examining Trial Transcript at p. 14, l. 13-16) Jaffe had been friends with Burnside since they went to high school together. (P. App. 113) (Jaffe Interview at p. 5, l. 9-13) Jaffe confirmed that Lord was Burnside's girlfriend and she was about to move in with Burnside. (P. App. 114) (Jaffe Interview at p. 7, l. 18 - p. 8, l. 1 and p. 9, l. 2-7), (P. App. 1111) (DVD of Jaffe Interview)

Jaffe arrived at Burnside's house about 7:00 that evening. Burnside was remodeling his house before Lord moved in, and Jaffe came to help him install a new dishwasher. (P. App. 115) (Jaffe Interview at p. 10, l. 19 - p. 11, l. 13) When Jaffe arrived, Burnside was drinking vodka and Red Bulls. (P. App. 115) (Jaffe Interview at p. 12, l. 1-6) Jaffe left about four hours later and went home. (P. App. 115) (Jaffe Interview at p. 13, l. 4-10) When he arrived home, Jaffe saw that he had a missed call from Lord, and she called again screaming something incoherent. (P. App. 115, 116) (Jaffe Interview at p. 13, l. 14-1 and p. 15, l. 4-14), (P. App. 111) (DVD of Jaffe Interview)

Jaffe rushed back to Burnside's house and when he arrived, the police and fire department were there. (P. App. 116) (Jaffe Interview at p. 17, l. 4-10) Lord was sobbing and told Jaffe that Burnside had shot himself in the head. She said they had been arguing over her birthday. (P. App. 116, 117) (Jaffe Interview at p. 17, l. 19 - p. 18, l. 1) Lord told Jaffe that she went into the bathroom to wash her face, heard a noise, and came out and Burnside was on the kitchen floor. (P. App. 117) (Jaffe Interview at p. 20, l. 3-7)

Jaffe Tells Thompson That Burnside Was Reckless With Guns

In his interview with Thompson a few hours after Burnside's death, Jaffe told Thompson that Burnside "was careless sometimes with guns." Sometimes Burnside would swing a gun around, thinking it was unloaded, not trying to hurt anybody, just being stupid. And Jaffe would say, "That's not a toy." (P. App. 118) (Jaffe Interview at p. 24, l. 9-19)  Burnside had a gun out that night that he pulled out of a kitchen drawer. Jaffe and Burnside were joking around and Jaffe asked where was his Beretta, and Burnside opened the drawer and showed it to him. (P. App.118) (Jaffe Interview at p. 24, l. 20 - p. 25, l. 10)

Jaffe said that he had seen Burnside play with guns two or three times. The last time that Burnside had been reckless with a gun, and Burnside was pointing the gun as if he knew for a fact it was unloaded without checking it. This made Jaffe nervous, because you never point a gun at anyone whether or not you know it is unloaded. It was not a big problem, but Burnside would do this sometimes and it would make Jaffe nervous. (P. App. 119) (Jaffe Interview at p. 28, l. 5 - p. 29, l. 13)

Jaffe told Thompson that Burnside was right handed. (P. App. 118) (Jaffe Interview at p. 25, l. 15-16)  Lundberg learned from Burnside's parents that Burnside was right handed, and Lundberg told Thompson. (P. App. 71) (Lundberg Depo. at p. 128, l. 1-8)

Thompson Misrepresents the Circumstances of Burnside's Death to Potential Witnesses

Although Thompson knew a few hours after Burnside's death that Burnside died of a contact wound to the right temple, Thompson persistently misrepresented to Burnside's friends that Burnside had been shot in the back of the head. Burnside's business partner

Jeff Gannon testified that he spoke with Thompson about 9:00 or 10:00 on the morning of Burnside's death.  (P. App. 97, 98) (Gannon Depo. at p. 24, l. 14-16 and p. 27, l. 2-3) Burnside's friend Eric Love was standing there with Gannon while Gannon related to him almost simultaneously what Thompson was telling Gannon about what happened.  (P. App. 109) (Love Depo. at p. 49, l. 8 - p. 50, l. 17)

Thompson told Gannon that he was very confident that Lord had shot Burnside.  (P. App. 98) (Gannon Depo. at p. 26, l. 16-17)  According to Gannon, Thompson's exact words were, "I'll bet my career on it, that she did it."  (*Id*. at p. 26, l. 22-23)  Thompson told Gannon that Burnside was shot in the back of the head, and further claimed that the angle of the bullet was up through the back of his head, from a shorter person of Lord's height shooting Burnside.  (P. App. 98) (Gannon Depo. at p. 27, l. 14- p. 28, l. 24)  Thompson also said that there had been no break-in at the house.  (P. App. 102) (Gannon Depo. at p. 61, l. 21-22)

Burnside's business partner Gannon went to police headquarters on June 17, 2010 and gave a recorded interview to Thompson.  (P. App. 99) (Gannon Depo. at p. 30, l. 24 - p. 31, l. 6)  During this interview, Thompson never corrected his earlier statement to Gannon that the bullet had been fired into the back of Burnside's head at an extremely upward angle.  (P. App. 100) (Gannon Depo. at p. 37, l. 1-19)

Gannon Confirms to Thompson that Burnside Played With Guns While Drinking

In his recorded interview on June 15, 2010, Gannon told Thompson that Burnside had multiple weapons in his house.  (P. App. 95) (Gannon Depo. at p. 15, 23 - p. 16, l. 1)

Gannon had been at Burnside's house and seen three rifles sitting in the living room and a handgun laying around.  (P. App. 95) (Gannon Depo. at p. 15, 23 - p. 16, l. 1)  This made Gannon very uncomfortable.  (*Id*. at p. 16, l. 14-15) Gannon testified that there were definitely times when he saw Burnside drinking and holding a gun.  (*Id*. at p. 16, l. 22-24)

<u>The Medical Examiner's Autopsy of Burnside's Body</u>

Dr. Reade Quinton is a medical examiner working for Dallas County at the Southwestern Institute of Forensic Sciences, referred to as SWIFS.  (P. App. 73) (Quinton Depo. at p. 5, l. 2-13)  He performed the autopsy on Michael Burnside.  (P. App. 73) (*Id*. at p. 8, l. 13-19)  The medical examiner file on Burnside includes a death investigation narrative prepared by a medical examiner's office field investigator.  (P. App. 74) (Quinton Depo. at p. 10, l. 17-25)  The death investigative narrative states that according to Dr. Harrison at Parkland, Burnside was admitted to the ER via ambulance with an apparent self-inflicted gunshot wound to the temple.  (P. App. 75) (Quinton Depo. at p. 13, l. 1-15) Dr. Quinton testified that with suicides involving gunshot wounds to the head, it is rare that they are not from contact wounds.  (P. App. 78) (Quinton Depo. at p. 34, l. 1-10)

The cause of Burnside's death was a gunshot wound of the head.  (P. App. 90) (Quinton Depo. at p. 103, l. 21-24)  Burnside had a contact gunshot wound to the right temple, and the bullet exited at the left temple.  Dr. Quinton explained that the gun was up against Burnside's head when it fired.  (P. App. 76) (Quinton Depo. at p. 17, l. 9-20) Burnside's blood alcohol level at the point of death was .17, which was slightly more than

double the legal limit in Texas for intoxication of .08. (P. App. 77) (Quinton Depo. at p. 26, l. 25 - p. 27, l. 10)

<u>Thompson Misleads the Medical Examiner</u>

On June 7, 2010, based on conversations he had that day with Thompson, Dr. Quinton changed the manner of Burnside's death to "homicide," which means death at the hands of another individual. (P. App. 79) (Quinton Depo. at p. 38, l. 21 - p. 19, l. 3) Dr. Quinton testified that he changed his ruling on manner of death based entirely on conversations he had with Thompson. (P. App. 79) (Quinton Depo. at p. 39, l. 4 - p. 40, l. 19) Thompson told Dr. Quinton that there was blood spatter on Lord's clothing, and if she was in another room from Burnside when the gunshot occurred [as Lord claimed], she should not have blood spatter on her clothing. (P. App. 80) (Quinton Depo. at p. 43, l. 6 - p. 44, l. 1) If a person had blood spatter on her clothing, she could not be in another room when the gun went off. (*Id.* at p. 46, l. 18 - p. 47, l. 8)

Dr. Quinton found this evidence about blood spatter to be "very significant" and was part of the reason he changed the manner of death. (*Id.* at p. 47, l. 21 - p. 48, l. 3) Dr. Quinton testified that blood spatter and blow-back could be analogous.[1] (P. App. 80) (Quinton Depo. at p. 44, l. 9-13) Blood spatter tends to be small droplets thrown at a high

---

[1] The medical examiner referred to "blood spatter," while the detectives referred to "blow-back." Lundberg explained that blow-back occurs when the pressure from the muzzle blast hits an object and blows back the fluid from the object onto the gun or the hand or the clothing of the person discharging the gun. (P. App. 62) (Lundberg Depo. at p. 59, l. 2-6) Lundberg testified that if a person puts a semiautomatic weapon up to another person's temple and fires the gun, there is a high probability that the shooter would have blow-back. (P. App. 63) (Lundberg Depo. at p. 63, l. 2-7) Thompson admitted that if Lord had shot Burnside and had not changed clothes, he would expect there to be blow-back stains. (P. App. 54) (Thompson Depo. at p. 118, l. 10-13)

velocity and looks different than blood stains from smears or pools of blood. (*Id.* at p. 46, l. 1-6)

After Lord had been arrested and charged with Burnside's murder, Dr. Quinton did some additional investigation after he spoke with Lord's criminal defense lawyer, who raised concerns and questions about Burnside's death being ruled a homicide. (P. App. 82) (Quinton Depo. at p. 49, l. 16-25)  Dr. Quinton learned that one of Burnside's friends [Jaffe] said that Burnside had been playing with a handgun, and no one had ever told Dr. Quinton this before.  Medical examiners commonly see people play with firearms, particularly under the influence of alcohol, and Dr. Quinton testified that he would have found this information helpful in determining the manner of death, because it goes to Burnside's state of mind. (*Id.* at p. 51, l. 6-16)  Thompson never made any reference to Burnside having a propensity to mix alcohol and firearms. (P. App. 83, Quinton Depo. at p. 54, l. 8-12)

When Dr. Quinton decided to investigate further, he went to the trace evidence lab, examined the clothing Lord was wearing, and found no blood spatter. (P. App. 83, 84) (Quinton Depo. at p. 56, l. 12 - p. 57, l. 11)  Dr. Quinton learned that Lord's clothing had never been tested for blood spatter before he tested it. (*Id.* at p. 57, l. 12-25)  This was the only time in Dr. Quinton's career that he has personally examined a suspect's clothing to determine if there was blood spatter. (P. App. 93) (Quinton Depo. at p. 163, l. 7-11)  Dr. Quinton's findings regarding blood spatter were inconsistent with what Thompson had told him. (P. App. 84) (Quinton Depo. at p. 58, l. 3-6)  Dr. Quinton also spoke with the

prosecutor on the case and confirmed that Burnside's friend said that Burnside had in fact been playing with a gun.  (P. App. 84, 85) (Quinton Depo. at p. 60, l. 19 - p. 61, l. 13)

Expert witness Kenneth LeCesne[2] notes that in his deposition, Medical Examiner Quinton stated that Thompson gave him inaccurate information regarding certain physical evidence in this case.  (P. App. 144) (LeCesne Report at p. 2)  In LeCesne's opinion, there is no reasonable explanation for Thompson telling the Medical Examiner that Lord had blow-back on her clothing.  (*Id.*)  When this is considered along with the rest of Thompson's conduct, it is LeCesne's opinion that Thompson was intentionally trying to mislead the Medical Examiner.  (*Id.*)

The Videotaped Interview of Sheida Rastegar

A month after Burnside's death, his neighbor Sheida Rastegar came to police headquarters on June 9, 2010, and was interviewed by Detective Lundberg.[3]  Lundberg's interview with Rastegar was videotaped.  (P. App. 39) (Thompson Depo. at p. 28, l. 12-22) Rastegar arrived for his interview at 11:07 a.m.  (P. App. 66) (Lundberg Depo. at p. 81, l. 24 - p. 82, l. 4)

Rastegar said that he had been lying in bed and heard a scream, so he went out his front door.  (P. App. 124) (Rastegar Interview at p. 3, l. 20 - p. 4, l. 14)  He saw a girl he had

---

[2] Kenneth LeCesne is a retired police officer who served for 24 years in the Dallas Police Department.  (P. App. 146) (LeCesne Resume at p. 1)  In his last assignment with the Department, LeCesne was the Homicide Unit Supervisor in the Crimes Against Persons Division (CAPERS), where he led and directed a team of 12 senior detectives who investigated murders, capital murders, and suicides in Dallas. (*Id.*)  LeCesne monitored the progress of all investigations and ensured proper preparation of all case documents for court.  (*Id.*)

[3]  Thompson and Lundberg claim to have interviewed Rastegar on the front porch of Rastegar's home approximately two days before Rastegar came to their office.  (P. App. 39) (Thompson Depo. at p. 29, l. 10-21) The interview at Rastegar's home was not recorded.

never seen before and a fire truck slowing down like they were looking for an address. (P. App. 125) (Rastegar Interview at p. 6, l. 11-13 and p. 7, l. 16-24)  Rastegar ran to the woman [Lord] and asked if she was okay, and she fell on her knees and said something to the effect of, "He's dying."  Rastegar repeatedly stated that these were his "impressions" and he does not remember her exact words.  (P. App. 125) (Rastegar Interview at p. 8, l. 10 - p. 9, l. 8) The "impression" that Rastegar received was that "he is shot in the head."  (*Id*. at p. 9, l. 13-18)

Rastegar told Lundberg that he had the "impression" that there was not another person in the house, it was only him and her, the guy is shot in the head, and he is not responding.  (P. App. 126) (Rastegar Interview at p. 10, l. 2-5)        Rastegar said he could not swear that Lord said something like she "didn't mean to shoot him."  Rastegar's "impression" was that there is him and her in the house and he is shot in the head.  (P. App. 126) (Rastegar Interview at p. 10, l. 24 - p. 12, l. 3)

When he was asked whether Lord said something like, "I shot him in the head, but it was an accident," Rastegar said that Lord did not say "I" shot him in the head.  Rastegar admitted to Lundberg, "The rest is surmise, is what I'm saying because there's only two people in the house and he got shot in the head.  And it was an accident.  And now, later on, I find out that – that part is later on.  Later on, I find out there is a shot in the back of the head, then I surmise the accident happened like this (demonstrating by pointing his finger to the back of his own head)." (P. App. 126) (Rastegar Interview at p. 12, l. 13-24), (P. App. 133) (Photos from Rastegar Interview)

Rastegar said he had "impressions."  The "impression" he got was that it was an accident.  He told Lundberg he probably surmised accident; there was no one in the house but him and her, he is shot in the head, and it wasn't like she shot him on purpose or he shot himself on purpose.  "It was an accident.  That's the impression I got.  I don't remember the exact words that were used.  I'm not even sure the word 'accident' was used."  Rastegar does not remember her saying the words, "It wasn't on purpose."  (P. App. 128) (Rastegar Interview at p. 20, l. 8-24)  Rastegar told Lundberg, "I just remember impressions."  (P. App. 128) (*Id* at p. 21, l. 1)

Rastegar told Lundberg that "She probably said 'I didn't mean it.'"  Rastegar then said, "It's possible she said 'I didn't mean it.'"  (P. App. 129, 130) (Rastegar Interview at p. 25, l. 15 - p. 26, l. 3)  Rastegar told Lundberg that his entire conversation with Lord happened in about five seconds.  (P. App. 128) (Rastegar Interview at p. 18, l. 1-8)

Thompson came into the interview room before Lundberg had finished speaking with Rastegar.  (P. App. 66) (Lundberg Depo. at p. 79, l. 15 - p. 80, l. 4)  In the interview, Rastegar points to the back of his own head six different times while he is describing his understanding of how Burnside must have been shot:  at 11:16 a.m., at 11:17, twice at 11:28, at 11:29, and at 11:36.  (P. App. 133) (Photos from Rastegar Interview), (P. App. 122) (DVD of Rastegar Interview)  The last time Rastegar pointed to the back of his own head was after Thompson had entered the room, and Rastegar is seen talking directly to Thompson as he points to the back of his own head.  (*Id*.)

Thompson agrees that in the videotaped interview, Rastegar says over and over that he does not know what Lord's exact words were, and he can only "surmise" what happened.  (P. App. 133) (Thompson Depo. at p. 40, l. 19-22), (P. App. 122) (DVD of Rastegar Interview)  Thompson and Lundberg agree that in the videotaped interview, Rastegar is plainly under the belief that Burnside was shot in the back of the head.  (P. App. 42) (Thompson Depo. at p. 33, l. 1-4), (P. App. 40) (Lundberg Depo. at p. 91, l. 2-19)  Thompson knew from the day of Burnside's death that he was not shot in the back of the head. (P. App. 40) (Thompson Depo. at p. 33, l. 18-21)

<u>Thompson Prepares an Affidavit of Arrest Warrant Seeking Lord's Arrest</u>

Thompson prepared and signed the Affidavit of Arrest Warrant relating to Lord.  (P. App. 3) (Thompson Depo. at p. 7, l. 18-23)  Lundberg testified that Thompson would have known "everything" about the case at the time Thompson prepared the Affidavit of Arrest Warrant.  (P. App. 64)  (Lundberg Depo. at p. 69, l. 3-7)  Lundberg informed Thompson of what was said by Rastegar in his recorded interview immediately after completion of the interview.  (P. App. 66) (Lundberg Depo. at p. 80, l. 5-12)

<u>The Magistrate Signs an Arrest Warrant for Lord Based on Thompson's Affidavit</u>

On June 9, 2010, Magistrate Nan Lollar signed the Affidavit of Arrest Warrant in which she determined, based on Thompson's representations, that probable cause existed to arrest Lord, and a Warrant of Arrest and Detention.  (P. App. 3, 4) (Thompson Depo. at p. 37, l. 13-18)

<u>Thompson Writes a Prosecution Report Indicating that Lord Had Fled to Escape Arrest</u>

Thompson testified that he wrote the prosecution report and is responsible for its content.  (P. App. 37) (Thompson Depo. at p. 9, l. 17-21)   In the prosecution report, Thompson stated that Lord had "fled" to Palmdale, California.  (P. App. 7) (Thompson Depo. at p. 90, l. 15-19)  Thompson agreed that he used the word "fled" to indicate that Lord was trying to run or get away from the situation as opposed to just going on a trip.  (P. App. 48) (Thompson Depo. at p. 90, l. 20 - p. 91, l. 5)  Thompson agreed that the use of the phrase that someone is trying to flee to California creates a very strong implication of guilt.  (P. App. 48) (Thompson Depo. at p. 92, l. 19-23)

Lord e-mailed Burnside's friend Eric Love a week before her arrest and told him that she was going to California to visit family and a friend.  (P. App. 107) (Love Depo. at p. 24, l. 14-17)  Brian Jaffe told Thompson *before* the arrest warrant was signed that Lord was planning to travel to California on June 9, 2010 to visit her father.   (P. App. 151) (Thompson's Responses to Requests for Production, DT 000146)  Thompson testified in his deposition that it did not matter to him that Lord was actually traveling with her nieces and nephews and had prepaid tickets for a couple of weeks.  (P. App. 48) (Thompson Depo. at p. 93, l. 24 - p. 94, l. 11)  Lord was arrested by United States Marshals at her father's home in California on June 11, 2010.  (P. App. 7) (Prosecution Report at p. 3)

<u>Thompson Testifies at Lord's Examining Trial in Her Criminal Case</u>

Thompson testified at a Preliminary Hearing (Examining Trial) in Lord's first-degree felony murder case on August 10, 2010.  (P. App. 38) (Thompson Depo. at p. 20, l. 17 - p. 21,

l. 1)  In the Examining Trial, Thompson claimed that he could not recall whether he told anyone that there were blow-back bloodstains on Lord's clothing, and that he did not know whether he believed that there were such stains on her clothing.  (P. App. 26) (Examining Trial Transcript at p. 17, l. 4-18)   Thompson's testimony on this point is directly contradicted by Dr. Quinton's testimony.  Quinton testified that Thompson told him that there was blood spatter (which he stated was analogous to blow-back) on Lord's clothing, and if she was in another room from Burnside when the gunshot occurred, she should not have blood spatter on her clothing.  (P. App. 80) (Quinton Depo. at p. 43, l. 6 - p. 44, l. 1)  In fact, Quinton found this evidence about blood spatter to be "very significant" and it was part of the reason he changed the manner of Burnside's death to "homicide."  (*Id*. at p. 47, l. 21 - p. 48, l. 3)

## III.    ARGUMENT AND AUTHORITIES

The summary judgment evidence that Lord discusses in this Brief and presents in her Appendix refutes Thompson's alleged entitlement to qualified immunity on her federal claims under 42 U.S.C. § 1983, and official immunity on her state claim for malicious prosecution.  At the very least, the evidence that Lord submits raises genuine issues of material fact as to Thompson's entitlement to qualified or official immunity.  Therefore, Thompson's motion for summary judgment should be denied in its entirety.

### A. Thompson is Not Entitled To Qualified Immunity for Lord's Federal Claims

Thompson asserts that he is entitled to qualified immunity for Lord's federal claims under 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U. S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U. S. 800, 818 (1982)). To determine whether a public official is entitled to qualified immunity, the district court determines: "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Jennings v. Patton*, 644 F. 3d 297, 300 (5th Cir. 2011). District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U. S. at 236.

### 1. The Facts That Lord Has Alleged Establish a Violation of a Constitutional Right

In her First Amended Complaint, Lord alleges that she was unlawfully arrested and detained without probable cause, and that Thompson intentionally or recklessly failed to disclose exculpatory evidence in the Affidavit of Arrest Warrant that he submitted to the magistrate in violation of the Fourth Amendment. Lord also alleges that the totality of the evidence proved that probable cause did not exist, but because Thompson knowingly and intentionally, or with reckless disregard for the truth, failed to present to the magistrate in

his Affidavit an accurate portrayal of the "totality of the evidence," an arrest warrant was signed and issued on June 9, 2010.

"Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been, or is being, committed and that the individual arrested is the guilty party." *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir.1994). In *Illinois v. Gates*, 462 U. S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Supreme Court reaffirmed the "totality of the circumstances" test for determining whether a search warrant is supported by probable cause. Although *Gates* dealt with the issue of whether a search warrant was properly issued, the Fifth Circuit has applied it to cases involving arrest warrants as well. *Hale v. Fish*, 899 F.2d 390, 399 (5th Cir. 1990), *citing United States v. Jackson*, 818 F.2d 345 (5th Cir.1987). A court must interpret affidavits for arrest or search warrants in a commonsense and realistic manner. *Hart v. O'Brien*, 127 F.3d 424, 443 (5th Cir. 1997), *citing United States v. Ventresca*, 380 U. S. 102, 108, 85 S. Ct. 741, 746, 13 L.Ed.2d 684 (1965).

An officer is liable for swearing to false information in an affidavit in support of a warrant, provided that: (1) the affiant knew the information was false or would have known it was false except for the affiant's reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information. *Franks v. Delaware*, 438 U. S. 154, 171, 98 S. Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Allegations of material omissions are treated similarly to claims of material misstatements. *United States v. Park*, 531 F.2d 754, 758-59 (5th Cir. 1976); *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990)

(district court's determination that an affidavit for arrest warrant containing misstatements and omissions constituted constitutional violations under *Franks v. Delaware* was affirmed; affidavit that omitted facts negating probable cause was insufficient to support a finding of probable cause).  When the facts omitted from an affidavit for arrest warrant are clearly critical to a finding of probable cause, the fact of recklessness may be inferred from proof of the omission itself.  *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980).  Lord's assertion that Thompson was at least reckless in failing to disclose exculpatory evidence to the magistrate and misrepresenting to the magistrate that probable cause existed "based on the totality of the evidence obtained" in order to obtain a warrant for her arrest states a valid cause of action under the Fourth Amendment.  *Hart v. O'Brien*, 127 F.3d 424, 442 (5th Cir. 1997).

> a.   **Thompson's Affidavit Omitted Significant Exculpatory Evidence That Was Critical to a Finding of Probable Cause and Misrepresented That Probable Cause Existed Based on the Totality of the Evidence**

Thompson's Affidavit of Arrest Warrant was misleading for several reasons.  First, Thompson omitted several significant facts that, considered as a whole, are exculpatory.  Although each individual piece of the evidence may or may not be exculpatory if considered solely in isolation, when considered as a whole, the evidence that Thompson omitted was exculpatory.  As noted above, the relevant test for determining whether a warrant is supported by probable cause is the "totality of the circumstances" test. *Illinois v. Gates*, 462 U. S. 213, 238 (1983).  Second, Thompson made affirmative misrepresentations

regarding the few statements that he selectively included in the Affidavit.  Finally, Thompson's claim that probable cause existed for the issuance of an arrest warrant "based on the totality of the evidence obtained" is contradicted, rather than supported, by the totality of the evidence.

There are only three possible assertions in Thompson's Affidavit of Arrest Warrant by which he sought to establish probable cause.  (P. App. 55) (Thompson Depo. p. 140, 1.5-13).   (1) the allegedly inconsistent statement that Thompson claims Lord made in her interview with him a few hours after Burnside's death; (2) the statement that Rastegar purportedly ascribed to Lord in his recorded interview; and (3) Thompson's assertion that probable cause existed "based on the totality of the evidence obtained."  (P. App. 3)

### (1)    Allegedly Inconsistent Statement of Lord

Thompson wrote in his Affidavit, "She [Lord] provided a statement that was inconsistent with the statement that was given by the complainant's friend [Jaffe]." Thompson's Affidavit did not specify or explain the purported inconsistency between Lord's statement and Jaffe's.  (P. App. 3)  Moreover, Thompson does not identify a single inconsistency of any kind, either material or minor, in his Affidavit in support of his summary judgment motion.  (D. App. 3)  The summary judgment evidence shows that Thompson's claim that Lord's statement and Jaffe's statement were inconsistent was misleading and is utterly insufficient to establish probable cause.

Lundberg agreed that the way Thompson referred to an inconsistent statement implied that there was an inconsistent statement of material fact.  (P. App. 70) (Lundberg

Depo. at p. 115, l. 8-13)  Lundberg testified, "I can only say I would assume if I were a judge, that that would be an inconsistent statement on something that's important. Otherwise, it wouldn't be in there."  (P. App. 70) (Lundberg Depo. at p. 116, l. 17-20)

Even in his summary judgment affidavit of October 30, 2012, Thompson does not identify a single inconsistency of any kind, either material or minor; he merely echoes his conclusory assertion to the magistrate that "Lord gave a statement that was inconsistent with the one given by Jaffe."  (D. App. 2)  This assertion provided no facts whatsoever for the magistrate to analyze in considering whether there was probable cause, and fails to provide any legitimate basis for a finding of probable cause.

Expert witness and former state district judge Mark Nancarrow[4] considers Thompson's Affidavit of Arrest Warrant to be materially misleading, and it is his opinion that probable cause to arrest Lord for murder would not exist were it not for Thompson's misrepresentations of facts, both affirmatively and by omission.  (P. App. 150) (Nancarrow Report at p. 2)  According to Nancarrow, Thompson's conclusory assertion of fact that Lord provided an inconsistent statement suggests an admission or indication of guilt.  By alleging an "inconsistency," Thompson suggests some sort of guilt on Lord's part, yet he entirely omits any specifics that would support his statement.  (*Id.*)  Nancarrow considers Thompson's statement about the purported inconsistencies between what Jaffe told him and what Lord told him to be misleading as written.  (*Id.*)  In summary, Thompson's

---

[4] Mark Nancarrow is a long-time criminal defense attorney, prosecutor, and former Criminal District Judge in Dallas County. (P. App. 149) (Nancarrow Report at p. 1)  Nancarrow was employed for 13 years by the Dallas District Attorney's Office as a prosecutor, where he served as a Chief Felony Prosecutor prior to being elected as a Criminal District Judge.  (*Id.*)  He served as the judge of the 204th District Court in Dallas County for 12 years, and in his capacity as a District Judge, he reviewed countless affidavits for arrest warrants.  (*Id.*)

assertion to the magistrate that Lord's statement and Jaffe's statement were inconsistent, without any factual basis provided to support it, was misleading and is utterly insufficient to establish probable cause.

### (2)     Alleged Excited Utterance by Lord to Rastegar

The second possible basis in Thompson's Affidavit to establish probable cause concerned a single statement made by Burnside's neighbor Sheida Rastegar.  Thompson wrote, "On Wednesday June 9, 2010 a witness came forward.  This witness is an attorney who resides across the street from the complainant.  This witness provided a recorded statement.  He stated that on the night of the offense, the suspect made an excited utterance to him inferring that she did not mean to shoot the complainant."  The summary judgment evidence shows that Thompson omitted or misrepresented facts to the magistrate regarding Rastegar's account of what Lord purportedly said to him moments after Burnside shot himself.  Thompson misrepresented the content of the Rastegar statement and represented to the magistrate that it was reliable, when in fact Thompson's description of what Rastegar said was inaccurate, and Rastegar's statement was unreliable.

Thompson knowingly and intentionally, or with reckless disregard for the truth, failed to present to the magistrate in his Affidavit an accurate portrayal of what Rastegar said in the recorded interview about Lord's alleged "excited utterance."  It is crystal clear from viewing the video of the recorded interview that Rastegar was unsure of what, if anything, Lord may have said to him, and Rastegar repeatedly admits that he does not remember what she said.  In addition, Rastegar candidly and freely speculates about what

occurred inside the Burnside home, and his entire belief about the incident is based on his faulty assumption that Burnside had been shot in the back of the head -- a rumor that seems to have originated with Thompson.  (P. App. 97, 98) (Gannon Depo. p. 24 1. 14-16 and p. 27, 1.2-3)  Thompson did not disclose any of these facts to the magistrate, but instead he presented a misleading portrayal of Rastegar' interview.

**Thompson's Characterization of Rastegar's Statement is Materially Misleading**

Thompson told the magistrate that Rastegar "provided a recorded statement.  He stated that on the night of the offense, the suspect made an excited utterance to him inferring that she did not mean to shoot the complainant."  Thompson never disclosed to the magistrate that, in fact, Rastegar said he _could not swear_ to what Lord might have said. (Rastegar Interview at p. 10, l. 24 - p. 12, l. 7)  In response to Lundberg's persistent, repetitive questioning, Rastegar told Lundberg that "She probably said 'I didn't mean it.'" Rastegar immediately backed off of his attempt to guess what Lord had really said and told Lundberg, "It's possible she said 'I didn't mean it.'"  (P. App. 129, 130) (Rastegar Interview at p. 25, l. 15 - p. 26, l. 3)  Rastegar admitted to Lundberg that his entire conversation with Lord happened in about five seconds.  (P. App. 128) (Rastegar Interview at p. 18, l. 1-8)

Thompson also never disclosed to the magistrate that again and again, Rastegar said he had "impressions" about what happened, but was _never_ able to clearly articulate what Lord purportedly told him.  Rastegar repeatedly admitted that he was relating his "impressions" and he did not remember Lord's exact words.  (P. App. 125) (Rastegar Interview at p. 8, l. 10 - p. 9, l. 8)  Although a potential determination of probable cause

rested squarely on Rastegar's shoulders -- in the absence of any other facts submitted in the Affidavit -- Thompson conceded in his deposition that in the videotaped interview, Rastegar says over and over that he does not know what Lord's exact words were, and he can only surmise what happened.  (P. App. 42) (Thompson Depo. at p. 40, l. 19-22)

Expert witness and former Dallas police detective Kim Sanders[5] believes that Thompson entirely misrepresented the statement attributed to Rastegar in his Affidavit. (P. App. 137) (Sanders Affidavit at p. 3)  Over and over Rastegar said he did not know what Lord had purportedly said.  (*Id*.)  Rastegar repeatedly said he "couldn't swear to it," yet Thompson uses Rastegar's statement as the primary fact supporting his belief that Lord committed murder.  (*Id*.)  Sanders considers this to be an extreme misrepresentation.  (*Id*.)

Expert witness and former Dallas Homicide Unit supervisor Kenneth LeCesne reviewed the Rastegar interview and noted in his report that Rastegar repeatedly stated he was not sure what Lord said to him outside of her home on the night of the incident.  (P. App. 144) (LeCesne Report at p. 2)  Rastegar said he could not swear to what Lord said, and that he was "surmising" about what happened.  (*Id*.)

Thompson proffered Rastegar's information about what Lord stated as the strongest of his three possible bases for probable cause, and tried to enhance Rastegar's credibility by noting that Rastegar is an attorney.  When the truth about Lord's "excited utterance" is

---

[5]  Kim Sanders is a retired police officer who served for 34 years in the Dallas Police Department.  (P. App. 139) (Sanders Resume at p. 1)  Sanders was a detective in the Narcotics division and the Homicide division. (*Id*.)  As a Homicide detective, Sanders investigated homicides, suicides, and other crimes against persons, and conducted numerous suspect and witness interviews.  (*Id*.)  He obtained numerous confessions on murder and capital murder investigations.  (*Id*.)  In his 34 years with the Dallas Police Department, Sanders investigated wrote hundreds of affidavits on which evidentiary and arrest warrants were based.  (P. App. 135) (Sanders Affidavit at p. 1)

revealed, however, there is no valid basis for a finding of probable cause based on Rastegar's statement about what Lord may have said.  The magistrate would not have issued an arrest warrant based on Rastegar's flimsy, vague account of Lord's alleged excited utterance had she known that Rastegar repeatedly told the detectives that he _could not swear_ to what Lord _actually_ said to him, but merely had "impressions" of what Lord _might_ have said.   Moreover, it is apparent from the recorded interview that Rastegar is engaged in wholesale speculation about the incident itself, and the manner in which it occurred.   It is clear from a review of the recorded interview that Rastegar's wild speculation has influenced what he believed Lord might or might not have said.

### Thompson Impliedly Represented That Rastegar's Statement Was Reliable When it Actually Was Completely Unreliable

Thompson's Affidavit was also misleading because he never disclosed to the magistrate that Rastegar's assertions about what happened the night that Burnside died were based entirely on a flawed premise and Rastegar's supposition.  Rastegar's neighbor told him that Burnside was shot in the back of the head. (P. App. 126) (Rastegar Interview at p. 12, l. 3-4)  That falsehood was the springboard for Rastegar's version of events as described in his interview.

Thompson's Affidavit was also misleading because Thompson did not disclose to the magistrate that Rastegar was playing amateur detective and "surmising" what "must have happened."  Rastegar admitted that he surmised because there were only two people in the house and Burnside was shot in the head, "then I surmise the accident happened like

this (demonstrating by pointing his finger to the back of his own head)." (P. App. 126) (Rastegar Interview at p. 12, l. 13-24), (P. App. 133) (Photos from Rastegar Interview)  In the interview, Rastegar points to the back of his own head six different times while he is describing his understanding of how Burnside must have been shot: at 11:16 a.m., at 11:17, twice at 11:28, at 11:29, and at 11:36.  (P. App. 133) (Photos from Rastegar Interview), (P. App. 122) (DVD of Rastegar Interview)  The last time Rastegar pointed to the back of his own head was after Thompson had entered the room, and Rastegar is seen talking directly to Thompson as he points to the back of his own head.  (*Id.*)

Expert witness Kenneth LeCesne noted in his report that all of Rastegar's "surmising" about what happened leads to the conclusion that the witness was unreliable. (P. App. 144) (LeCesne Report at p. 2)  A review of the recorded interview demonstrates that Rastegar also stated at least six times that he was told by other witnesses that the decedent (Michael Burnside) had been shot in the back of the head, and he surmised that since there were only two people in the house, she must have shot him.  (*Id.*)  Neither Lundberg nor Thompson ever advised Rastegar that his understanding of where Burnside had been shot was incorrect.  (*Id.*)  It is LeCesne's opinion that any statements from Rastegar were completely unreliable due to his reliance on the faulty assumption.  (*Id.*)

Expert witness Kim Sanders also considers Rastegar to be completely unreliable in his recorded interview.  (P. App. 137) (Sanders Affidavit at p. 3)  Both Thompson and Lundberg were aware that Rastegar's assumption that Burnside had been shot in the back of the head was wrong, and that it was causing Rastegar to speculate about what had

occurred inside the Burnside house and was influencing his thoughts about what Lord may, or may not, have said.  (*Id*.)

### Thompson Changes His Story

Thompson has offered several versions of when and how he learned the information about Rastegar that he noted in his Affidavit of Arrest Warrant.  By the time of his deposition in this case, Thompson apparently realized that the account in his Affidavit of Arrest Warrant about the Rastegar statement was less than accurate, because Thompson denied that he was even aware of what was said in the Rastegar videotaped interview before going to the magistrate to obtain the arrest warrant for Lord.  (P. App. 42) (Thompson Depo. at p. 39, l. 11-15)  Contrary to the plain language in his Affidavit of Arrest Warrant, Thompson claimed in his deposition that the statement about Lord's alleged excited utterance attributed to Rastegar in the Affidavit was based solely on what Rastegar had said two days earlier at his home.

Thompson's testimony is directly contradicted by Lundberg, who testified that he brought Thompson up to speed on what was said in the Rastegar interview immediately after he and Rastegar left the room.  (P. App. 66) (Lundberg Depo. at p. 80, l. 5-12) Thompson's testimony is further contradicted by the plain language of the Affidavit for Arrest Warrant, in which he stated, "On Wednesday June 9, 2010 a witness came forward. This witness is an attorney who resides across the street from the complainant.  This witness provided a recorded statement.  He stated that on the night of the offense, the suspect made an excited utterance to him inferring that she did not mean to shoot the

complainant."  It is also further contradicted by notes in Thompson's own Investigative File, which state that Thompson prepared the Affidavit of Arrest Warrant based on the facts presented by Rastegar in his recorded interview.  (P. App. 67) (Lundberg Depo. at p. 83, l. 1-14 and p. 85, l. 3-9)   The note in Thompson's Investigative File states "On Wednesday June 9, 2010 at 11:07 a.m., Rastegar arrives at the Jack Evans Police Headquarters.  Lundberg interviewed him and documented his interview.  Based on the facts that were presented by Rastegar, Thompson prepared an Affidavit for Arrest on behalf of Lord on same date."  (P. App. 151) (Thompson Responses to RFP DT#00146)

## Thompson Changes His Story, Again

Apparently recognizing the dubiousness of claiming that he was not aware of what Rastegar said in the recorded interview (especially in light of Thompson actually being in the video room at one point), Thompson now seems to have abandoned this claim. Nowhere in Defendant's Motion for Summary Judgment is that position taken and, in fact, a plain reading of Thompson's Motion for Summary Judgment Affidavit of October 30, 2012 suggests that he _was aware_ of the statements made in Rastegar's recorded interview _before_ preparing his Affidavit for Arrest, and certainly before swearing to it in front of the Magistrate.  (D. App. 3)  However, instead of denying his knowledge of the recorded interview, he now seeks to minimize the Rastegar rambling by saying that Rastegar "equivocated" (D. App. 3).  That characterization to this Court is no less misleading than the one to Magistrate Lollar for the purpose of obtaining the Arrest Warrant.

**Further Proof that Thompson is Being Less Than Forthcoming**

Thompson testified that he first learned that Rastegar thought Burnside had been shot in the back of the head when he watched the video of Lundberg's interview of Rastegar. (P. App. 41) (Thompson Depo. at p. 34, l. 7-11)  Thompson testified that until he saw the video of Rastegar, he had never heard any reference by Rastegar indicating that Rastegar believed that Burnside had been shot in the head. (P. App. 41) (Thompson Depo. at p. 34, l. 12-15)  Thompson's testimony is directly contradicted by the videotape of Lundberg's interview with Rastegar, because near the end of the interview, Thompson is clearly seen and heard entering the room, and Rastegar points to the back of his own head while he describes once again to Thompson and Lundberg how he thought Burnside must have been shot. (P. App. 133) (Photos from Rastegar Interview)

In summary, the evidence shows that Thompson both omitted and misrepresented facts to the magistrate regarding Rastegar's account of an "excited utterance" purportedly made by Lord, which was the primary basis for Thompson's assertion that probable cause existed to arrest Lord on a murder charge.  Thompson misrepresented the content of the Rastegar statement and represented to the magistrate that it was reliable, when in fact Thompson's description in the Affidavit of what Rastegar said was inaccurate, and Rastegar's statement was unreliable.

### (3)    "Based on the Totality of the Evidence . . ."

Finally, Thompson's claim in his Affidavit of Arrest Warrant that probable cause existed for the issuance of an arrest warrant "based on the totality of the evidence

obtained" is contradicted, rather than supported, by the totality of the evidence.  Lord has shown that Thompson made a misleading statement in the Affidavit of Arrest Warrant when he asserted that Lord's statement was inconsistent with Jaffe's statement.   In addition, Thompson misrepresented the content of Rastegar's statement, portraying it as solid when, in fact,  it was anything but, and failed to disclose to the magistrate the unreliability of Rastegar's statement.  Thompson made other significant omissions which, when considered as a whole, negate the existence of probable cause.  The most egregious examples of Thomson's omissions include the nature of Burnside's injury, the fact that Burnside was drinking heavily that evening, and was known to be reckless with guns, especially when he had been drinking.

### Thompson Never Disclosed to the Magistrate That Burnside, Who Was Right Handed, Died of a Contact Wound to the Right Temple

Thompson knew within hours of Burnside's death that Burnside, who was right handed, had died from a gunshot wound to his right temple.  Lundberg related this information to Thompson by at least 7:00 a.m. that same morning.  (P. App. 60) (Lundberg Depo. at p. 36, l. 3 - p. 37, l. 1)  Thompson did not disclose this significant fact to the magistrate or allude to it in any way in his Affidavit.

Thompson testified that when he learned that Burnside had died of a contact wound, he never considered the possibility that it might be a self-inflicted gunshot wound. (P. App. 52) (Thompson Depo. at p. 106, l. 25 - p. 107, l. 3)  In his deposition, Thompson repeatedly denied that a contact wound to the right temple by a right-handed person at a

slightly upward trajectory is more consistent with a suicide than a homicide.  (P. App. 43, 44) (Thompson Depo. at p. 62, l. 19-22 and p. 66, l. 11-20)  However, in the Examining Trial before a state district judge, Thompson truthfully acknowledged that a contact wound is more consistent with a suicide.  (P. App. 29) (Examining Trial at p. 20, l. 21-23)  Thompson also admitted to the judge there was no forensic or physical evidence that in any way implicated or tied Lord to the shooting of Burnside.  (P. App. 24) (Examining Trial at p. 15, l. 4-7)  That bears repeating!  Thompson acknowledged under oath two months AFTER he swore in his Affidavit of Arrest Warrant that "the totality of the evidence" suggested a finding of probable cause that, in fact, ***there was no forensic or physical evidence that in any way implicated or tied Lord to the shooting of Burnside***.

Former Dallas Detective Sanders sums up succinctly the magnitude of some of the omissions by Thompson as follows:

> Thompson's failure to indicate in the affidavit that Burnside died of a contact wound to the right temple and that he was right handed was also a material omission, especially in light of the facts that there was no evidence of a struggle, and that Mr. Burnside was standing when shot, all of which was known by Thompson when he presented his affidavit to the Judge.  Thompson's failure to include this information, especially when considered with the fact that there was approximately a foot difference in the height of Ms. Lord and Mr. Burnside was intentional in my opinion.
>
> Thompson also failed to state in his affidavit that Mr. Burnside was extremely intoxicated and that his own gun was found near his body.

P. App. 137 (Sanders Affidavit at p. 3)

**Thompson Never Disclosed to the Magistrate**
**That Burnside Was Reckless With Guns**

Another egregious omission from Thompson's Affidavit pertains to the fact that Thompson knew from the initial hours of his investigation that Burnside played with guns, including when he was drinking.   Jaffe told Thompson in his interview hours after Burnside's death that Burnside "was careless sometimes with guns." Jaffe said that sometimes Burnside would swing a gun around, thinking it was unloaded, not trying to hurt anybody, just being stupid.  And Jaffe would say to him, "That's not a toy."  (P. App. 118) (Jaffe Interview at p. 24, l. 9-19)  Jaffe told Thompson that Burnside had a gun out that night that he pulled out of a kitchen drawer.  Jaffe and Burnside were joking around and Jaffe asked where was his Beretta, and Burnside opened the drawer and showed it to him. (P. App. 118) (Jaffe Interview at p. 24, l. 20 - p. 25, l. 10)

Thompson also lacks credibility when he denies that Burnside was extremely intoxicated that night, even though Burnside's blood alcohol level measured .17 several hours after his death, which is more than twice the legal limit.  (P. App. 50) (Thompson Depo. at p. 99, l. 25 - p. 100, l. 24)  Thompson's significant omissions about the nature of Burnside's injury, the lack of a struggle, and the fact that he was known to be reckless with guns when drinking, and was extremely intoxicated that night, when considered as a whole with the other evidence, can hardly be said to support a finding of probable cause. The evidence shows that Thompson knowingly and intentionally, or with reckless disregard for the truth, made a material misrepresentation to the magistrate in his Affidavit

when he asserted that the "totality of the evidence" established the existence of probable cause for the issuance of an arrest warrant.

### b. No Reasonable Officer Could Have Considered the Omissions and Misrepresentations to be Lawful

The summary judgment evidence shows that no reasonable officer could have considered the omissions and misrepresentations that Thompson made in the Affidavit of Arrest Warrant to be lawful. Generally, when an officer is aware of material information that casts doubt on, or is directly contrary to, the information contained in his warrant affidavit, that fact may serve as evidence that a reasonably well trained officer would have known that the arrest was illegal despite the magistrate's authorization. *United States v. Leon*, 468 U. S. 897, 922 n.23, 104 S. Ct. 3430, 82 L.Ed.2d 677 (1984). Accordingly, the "deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Id.*, 468 U. S. at 914 (citing *Franks v. Delaware*, 434 U. S. 154 (1978). The summary judgment evidence discussed in this Brief establishes that Thompson exhibited an ongoing pattern of deception that indicates an absence of mistake in the statements he presented and the facts he omitted in the misleading Affidavit of Arrest Warrant that he submitted to the magistrate.

### (1) Expert Report of Kim Sanders

It is expert witness Kim Sanders's opinion that the arrest of Olivia Lord was without probable cause. (P. App. 136) (Sanders Affidavit at p. 2) It is further his opinion that no

reasonable officer could have believed, based on the totality of the evidence, that probable cause existed to have Lord arrested and charged with first degree murder.  (*Id*.)  It is also Sanders's opinion that Thompson, knowingly and intentionally, or with reckless disregard for the truth, misrepresented the facts in his Affidavit in order to obtain an arrest warrant.  (*Id*.)  Sanders believes that Thompson, knowingly and intentionally, or with reckless disregard for the truth, omitted from his affidavit material facts within his knowledge which would have negated probable cause.  (*Id*.)

More specifically, it is Sanders's opinion that Thompson engaged in a persistent pattern of manipulation and misrepresentation that started at the very beginning of his investigation, and continued through his testimony at Lord's Examining Trial.  (P. App. 136) (Sanders Affidavit at p. 2)  Sanders notes many specific instances of Thompson's manipulation and misrepresentation, including:  stating to witnesses that Burnside had been shot in the back of the head when Thompson knew it was a contact wound to the right temple; misrepresenting to the Medical Examiner that Lord's clothing had blow-back stains when, in fact, Thompson knew it had never been tested; completely and totally misrepresenting statements made by witness Rastegar during his recorded interview; failing to identify in his affidavit the "inconsistency" he claims existed in statements made by Lord in her recorded interview, and thus creating an inference to the magistrate that an inconsistency existed on a material fact, when there was no inconsistency; entirely failing to include numerous facts in his affidavit that would lead any reasonable person to the undeniable conclusion that Burnside died of a self-inflicted gunshot wound; alleging in the

Prosecution Report that Lord fled to California when he knew that was not true; and misrepresenting the facts during his testimony in the Examining Trial.  (*Id*.)

### (2)     Expert Report of Kenneth LeCesne

In Kenneth LeCesne's opinion, Thompson misled witnesses by telling them Burnside had been shot in the back of the head, he misled the Medical Examiner, he misled the magistrate by misrepresenting facts in his Affidavit and leaving out material ones, and he misled the prosecutor by claims he asserted in the Prosecution Report.  (P. App. 145) (LeCesne Report at p. 3)  It is LeCesne's opinion that these misrepresentations cannot all be explained by mistake or oversight.  In LeCesne's opinion, they were intentional.  (*Id*.)

LeCesne has reviewed thousands of arrest reports, incident reports, and affidavits for the purpose of determining whether probable cause existed.  (P. App. 145) (LeCesne Report at p. 3)  He has reviewed Thompson's Affidavit on which the magistrate relied to issue the arrest warrant.  (*Id*.)  He has also reviewed the facts and circumstances surrounding the death of Burnside.  (*Id*.)  It is LeCesne's strong opinion that probable cause did not exist to charge Lord with Murder, and that the issuance of the arrest warrant was solely the result of Thompson's misrepresentations and omission of relevant facts in his Affidavit.  (*Id*.)

The evidence discussed herein shows that no reasonable officer could have considered the omissions and misrepresentations that Thompson made in the Affidavit of Arrest Warrant to be lawful.  At the very least, genuine issues of material fact exist as to whether a reasonable officer could have believed omitting the contrary evidence and

making the misrepresentations discussed above was lawful.  *Jones v. City of Grand Prairie, Tex.*, No. 3:97-CV-1907-H, 1997 U.S. Dist. Lexis 217, at *21 (N.D. Tex. Jan. 6, 1999) (officer's summary judgment motion on qualified immunity denied; "even though some evidence supported the finding of probable cause to arrest Plaintiff, it is doubtful that a reasonable officer should have omitted contrary evidence from an affidavit for an arrest warrant . . .").

## 2.    Lord's Fourth Amendment Right to be Free From Unlawful Arrest Was Clearly Established at the Time of Thompson's Misconduct

Michael Burnside died on the night of May 9, 2010, and on June 9, 2010, Thompson submitted to the magistrate the Affidavit of Arrest Warrant in which he omitted evidence that was exculpatory when considered as a whole and misrepresented to the magistrate that probable cause existed "based on the totality of the evidence obtained."  Lord relies on the *Franks* case from 1978, in which the Supreme Court reaffirmed that an officer is liable for swearing to false information in an affidavit in support of a warrant.  *Franks v. Delaware*, 438 U. S. 154, 171, 98 S. Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).  Additionally, the Fifth Circuit determined in the *Hart* case in 1997 that a claim that a police officer was at least reckless in failing to disclose exculpatory evidence to the magistrate in order to obtain an arrest warrant states a valid cause of action under the Fourth Amendment.  *Hart v. O'Brien*, 127 F.3d 424, 442 (5th Cir. 1997).  Lord's right to be free from unlawful arrest has been clearly established for decades. Thompson never disputes in his summary judgment motion that the right to be free from unlawful arrest had been clearly established long before he made the omissions and misrepresentations in the Affidavit for Arrest Warrant and took the

other challenged actions regarding Lord in 2010.  For all of these reasons, Thompson's Motion for Summary Judgment regarding his claim of qualified immunity on Lord's federal claims should be denied.

### 3. On its Face, the Affidavit for Arrest Warrant Does Not Establish Probable Cause for Murder

As Lord has discussed, there are only three possible assertions in Thompson's Affidavit of Arrest Warrant by which he sought to establish probable cause.  The first conclusory assertion concerned the allegedly inconsistent statement of Lord, and Thompson provided no factual basis for that assertion from which the magistrate could determine probable cause.  The third assertion, that probable cause existed "based on the totality of the evidence obtained," is similarly conclusory and Thompson likewise provided no factual basis for the assertion.

The only assertion with any supporting facts that Thompson cites to establish probable cause is the second assertion, that Rastegar "provided a recorded statement.  He stated that on the night of the offense, the suspect made an excited utterance to him inferring that she did not mean to shoot the complainant."  Lord has shown that Thompson misrepresented Rastegar's account of what she allegedly said in his Affidavit for Arrest Warrant.  Even if Thompson had accurately represented Rastegar's statement, however, the statement in the Affidavit of Arrest Warrant attributed to Lord could not establish probable cause for murder.  Therefore, on its face, the Affidavit does not establish probable cause for murder.

In *Malley v. Briggs*, the Supreme Court held that a police officer is not entitled to qualified immunity when he submits a warrant application that is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Malley v. Briggs*, 475 U. S. 335, 345, 106 S. Ct. 1092, 1098, 89 L.Ed.2d 271 (1986).  Here, the Affidavit of Arrest Warrant seeks a charge of first-degree felony murder under Texas Penal Code § 19.02.  The only applicable part of the statute states that a person commits the offense of murder if she "intentionally or knowingly causes the death of an individual."  Under Texas Penal Code § 6.03(b), "a person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist."

Thompson swore in his Affidavit that according to Rastegar, Lord inferred that she did not mean to shoot Burnside.  This does not encompass either the intentional or knowing conduct required for a murder charge as defined in the Penal Code.  Because Thompson's Affidavit lacks assertions of fact that, even if true, would establish probable cause, his warrant application "is so lacking in indicia of probable cause as to render official belief in its existence unreasonable" under *Malley v. Briggs*.

### B.  Thompson is Not Entitled to Official Immunity for Lord's State Law Claim

In addition to her federal claims, Lord asserts a claim of malicious prosecution under Texas law.  To prove malicious prosecution, a plaintiff must show: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4)

the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 516 (Tex. 1997); *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006).

Thompson asserts that he is entitled to official immunity for Lord's claim of malicious prosecution. "Police officers are entitled to official immunity from state claims arising out of (1) their performance of discretionary duties (2) that are within the scope of their authority, (3) provided they act in good faith." *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002). Official immunity is an affirmative defense, and to obtain summary judgment on the basis of official immunity, a police officer must conclusively establish each of these elements. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000).

Lord acknowledges that when Thompson prepared and submitted the affidavit for arrest warrant, he was performing a discretionary duty within the scope of his authority as a police officer. At issue is the third element; the evidence shows that Thompson was not acting in good faith in omitting from his Affidavit the numerous critical facts that diputed Thompson's portrayal of events and which, taken as a whole, were either exculpatory or materially misleading, and would have negated probable cause. At a minimum, genuine issues of material fact exist as to whether he acted in good faith. To establish good faith, the officer must show that a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Telthorster*, 92 S.W.3d at 465. "Simple subjective pronouncements of good faith by an officer, or by experts supporting the officer's

assertions, are insufficient as a matter of law to meet the summary judgment movant's burden of showing good faith." *Harless v. Niles*, 100 S.W.3d 390, 398 (Tex. App.—San Antonio 2002, no pet.), *citing Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex. 1997).

> **1.     Thompson Has Failed to Establish That His Actions in Misleading the Magistrate and Misrepresenting that Probable Cause Existed From the Totality of the Evidence in His Affidavit Were Taken in Good Faith**

Lord incorporates all of her summary judgment evidence into her assertion that Thompson did not act in good faith.  The evidence Lord submits in her Appendix and has discussed at length in this Brief shows that Thompson intentionally or recklessly omitted from the Affidavit substantial evidence that, considered as a whole, was exculpatory, and selectively submitted evidence in a manner that was misleading.  These omissions and misstatements negated probable cause to arrest Lord.  Thompson further misrepresented to the magistrate that probable cause existed "based on the totality of the evidence obtained" when the totality of the evidence tended to negate rather than support probable cause.

Expert witness Kim Sanders discussed in his report that Thompson engaged in a persistent pattern of manipulation and misrepresentation that started at the very beginning of his investigation, and continued through his testimony at Lord's Examining Trial.  (P. App. 136) (Sanders Affidavit at p. 2)  And as expert witness Kenneth LeCesne noted, Thompson misled witnesses by telling them Burnside had been shot in the back of the head, he misled the Medical Examiner, he misled the magistrate by misrepresenting facts in his Affidavit and leaving out material ones, and he misled the prosecutor by claims he

asserted in the Prosecution Report.   (P. App. 145) (LeCesne Report at p. 3)   It is inconceivable that these actions could be considered as taken in good faith.

In addition, Thompson wrote in the prosecution report that Lord had "fled" to California.  (P. App. 7) (Thompson Depo. at p. 90, l. 15-19)  In his deposition, Thompson agreed that he used the word "fled" to indicate that Lord was trying to run or get away from the situation as opposed to just going on a trip.  (P. App. 48) (Thompson Depo. at p. 90, l. 20 - p. 91, l. 5)  Thompson knew when he wrote the prosecution report that Lord was not attempting to "flee" to California.  Brian Jaffe told Thompson *before* the arrest warrant was signed that Lord was planning to travel to California on June 9, 2010 to visit her father.  (P. App. 151) (Thompson's Responses to Requests for Production, DT 000146)  Thompson testified in his deposition that it did not matter to him that Lord was actually traveling with her nieces and nephews and had prepaid tickets for a couple of weeks.  (P. App. 48) (Thompson Depo. at p. 93, l. 24 - p. 94, l. 11)  Lord was arrested by United States Marshals at her father's home in California on June 11, 2010.  (P. App. 7) (Prosecution Report at p. 3) Thompson lied about Lord's travel plans in his prosecution report, and went out of his way to orchestrate Lord's arrest in a very humiliating way by causing her to be arrested at her family's home.  These actions contradict any assertion that Thompson acted in good faith.

Thompson merely states in his self-serving Affidavit in support of his summary judgment motion that "At all times during my investigation and preparation of the arrest warrant, as shown by the above facts, I was acting in good faith and within my discretionary authority as a police officer."   (D. App. 4)   "Simple subjective

pronouncements of good faith by an officer, or by experts supporting the officer's assertions, are insufficient as a matter of law to meet the summary judgment movant's burden of showing good faith." *Harless*, 100 S.W.3d at 398. The overwhelming weight of the evidence regarding Thompson's material omissions and mischaracterizations of facts and evidence as discussed at length in this Brief refutes Thompson's assertion, and Thompson has not met his burden to establish that his actions were taken in good faith under the Texas cases that Lord has cited.

### 2. Alternatively, There Are Genuine Issues of Material Fact as to Whether Thompson Has Established Good Faith

In this alternative, there are genuine issues of material fact with respect to the evidence that Lord has adduced for her malicious prosecution claim. Lord incorporates by reference the case law and evidence cited in this Brief and the discussion regarding Thompson's complete lack of entitlement to qualified immunity. *See Jones v. City of Grand Prairie, Tex.*, No. 3:97-CV-1907-H, 1997 U.S. Dist. Lexis 217, at *26 (N.D. Tex. Jan. 9, 1999) (genuine issues of material fact existed as to the officer's good faith because it was unclear whether probable cause existed to arrest the plaintiff or whether the officer's actions rose to the level of recklessness).

### IV. CONCLUSION

Plaintiff H. Olivia Lord has produced ample competent summary judgment evidence to demonstrate that genuine issues of material fact exist with respect to Defendant Dwayne A. Thompson's entitlement to qualified immunity for her federal claims, and

official immunity for her state claim.  This evidence precludes summary judgment in favor

of Thompson.  Lord therefore asks the Court to deny Thompson's Motion for Summary

Judgment in its entirety, permit this case to proceed to trial on the merits, and for all other

relief to which Lord may be entitled.

Respectfully submitted,

By:   _/s/ Don Tittle_
   Don Tittle, attorney-in-charge
   State Bar # 20080200
LAW OFFICES OF DON TITTLE
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
(214) 522-8400
(214) 389-1002- Fax
dontittle@earthlink.net

*ATTORNEY FOR PLAINTIFF*
 *H. OLIVIA LORD*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon
counsel of record for all parties by electronic service via the Court's CM/ECF system on this
the 30th day of November, 2012.

 _/s/ Don Tittle_
 Don Tittle